
**depo summary PRO**

| | |
|---|---|
| 92:24–93:1 | The deposition concludes at 2:39 PM |
| 93:2–93:11 | Off-record discussion occurs about transcript copies, with Caplis, Ripplinger, and Vig requesting copies |
| 93:12–93:14 | The proceedings conclude at 2:40 PM |
| 94:1–95:25 | The remainder of the document contains certification pages and reporter's certificate |

## Transcript Text

```
                      Ignacio Cruz-Mendoza
                         March 27, 2025
 1      DISTRICT COURT, JEFFERSON COUNTY, COLORADO
 2      Case No. 2025CV30010, Courtroom 12
 3      _____

 4      DEANN MILLER as surviving spouse of SCOTT MILLER,
 5      deceased,
 6           Plaintiff,
    v.
 7      MONIQUE TRUCKING LLC, a California limited company,
 8      and IGNACIO CRUZ-MENDOZA, an individual,

 9           Defendants.
10      _____
11         VIDEO-RECORDED DEPOSITION OF IGNACIO CRUZ-MENDOZA
                         March 27, 2025
12      _____

13                   PURSUANT TO NOTICE, the video-recorded
14      deposition of IGNACIO CRUZ-MENDOZA was taken on behalf
15      of the Plaintiff at Jefferson County Detention Center,
16      200 Jefferson County Parkway, Golden, Colorado 80401,
17      on March 27, 2025, at 9:24 AM, before Deborah A.
18      VanDemark, Registered Professional Reporter and
19      Colorado Realtime Certified Reporter.




                 U.S. Legal Support | www.uslegalsupport.com
[[ Line numbers on this page added during summarization for reference ]]
```

Ignacio Cruz-Mendoza
March 27, 2025

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.

**EXHIBIT 2**



| 56:4–56:13 | Cruz-Mendoza states there was no specific delivery time requirement, and he would stop for rest, fuel, and load inspections as needed |
| --- | --- |
| 56:14–56:17 | Cruz-Mendoza identifies that a secretary made other notes on Exhibit 1 |
| 56:18–56:23 | Cruz-Mendoza clarifies that security personnel, not office staff, verify load tie-downs |
| 57:1–57:5 | Cruz-Mendoza describes receiving documents with instructions and safety rules, including requirements for work boots |

### Route Planning and Pre-Crash Journey ↻

Cruz-Mendoza testifies about using GPS for navigation and his experience with mountain driving. He acknowledges that metal fell from his trailer, killing Mr. Miller. He states he made no stops before the crash, had rested over the weekend, and had a full tank. While experienced with Colorado trips, this was his first time on Highway 285. He avoids phone calls while driving to stay focused.

| 57:13–57:19 | Cruz-Mendoza confirms he used his phone's GPS for directions to the delivery location |
| --- | --- |
| 57:20–57:23 | Cruz-Mendoza states he cannot recall what time he left Searing on June 11 |
| 58:3–58:9 | Cruz-Mendoza explains his assessment of professional loading based on his experience and notes he never had problems on previous Colorado trips |
| 58:13–58:14 | Cruz-Mendoza states he transported train tires and this was his job |
| 58:18–58:22 | Cruz-Mendoza describes that security inspections were standard at all loading locations |
| 59:1–59:8 | Cruz-Mendoza acknowledges that the metal fell off his trailer and killed Mr. Miller |
| 59:9–59:16 | Cruz-Mendoza states he made no stops before the crash, had a full tank of diesel, and had rested over the weekend |
| 59:17–59:20 | Cruz-Mendoza cannot remember how many hours he drove between leaving Searing and the crash |
| 60:1–60:3 | Cruz-Mendoza confirms he only called his boss to report being loaded and receive instructions to head to New Mexico |
| 60:4–60:6 | Cruz-Mendoza identifies his route as highways 25 and 285 |
| 61:10–61:20 | Cruz-Mendoza states he had no headset and avoids making calls while driving to stay focused on traffic |
| 61:21–62:2 | Cruz-Mendoza says he had not driven on 285 before but frequently drove in mountains due to Colorado trips |

### Crash Description and Immediate Events ↻

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.

EXHIBIT 2



| | Cruz-Mendoza testifies that brake failure caused the crash. He describes attempting to slow down using downshifting, air brakes, and the emergency lever, but nothing worked. He states he couldn't blow his horn while struggling with controls or drive off the road due to a rock wall. He claims he never realized metal was falling from his trailer. Ms. Miller accuses him of lying about road conditions. |
|---|---|
| 62:3–62:5 | Cruz-Mendoza explains the crash occurred because his brakes failed |
| 62:11–62:22 | Cruz-Mendoza describes seeing construction workers, trying to reduce speed, moving to center lane, and the crash happening 10-15 minutes later |
| 63:1–63:5 | Cruz-Mendoza clarifies he tried to reduce speed when entering town but had no brakes |
| 63:6–63:9 | Exhibit 2 is referenced during questioning about the crash timeline |
| 63:20–63:23 | Cruz-Mendoza describes attempting to downshift, use air brakes, and pulling emergency lever, but nothing worked |
| 63:24–64:10 | Cruz-Mendoza confirms he did not blow his horn as he was struggling with everything else |
| 64:11–64:15 | Cruz-Mendoza states he never realized metal beams and pipes were coming off his trailer |
| 64:16–64:19 | Cruz-Mendoza claims he couldn't drive off the road due to a rock wall |
| 64:20–65:16 | An altercation occurs when Ms. Miller calls Cruz-Mendoza a liar regarding the road conditions |

### Employment Background and Future Plans ↻

Cruz-Mendoza testifies about his connection to Monique Trucking through Manrique, whom he met in Indio due to their shared Sinaloa background. He describes minimal hiring requirements and early trucking experience. He invokes his Fifth Amendment rights regarding immigration status questions. He states he will be released soon and plans to work in construction with his brother in California.

| 65:17–65:24 | A recess is taken from 12:23 PM to 1:27 PM |
|---|---|
| 66:4–66:10 | Cruz-Mendoza explains he met Manrique from Monique Trucking in Indio, as they were both from Sinaloa |
| 66:11–66:15 | Cruz-Mendoza describes his limited interaction with Jose Luis through Manrique |
| 66:16–66:19 | Cruz-Mendoza states no application was required for Monique Trucking, only a license check for insurance |
| 66:20–66:25 | Cruz-Mendoza explains his early trucking experience as a helper on tomato routes at age 17 |
| 67:3–67:15 | Cruz-Mendoza refuses to answer questions about his immigration status and Monique's knowledge of it |
| 67:16–68:8 | Cruz-Mendoza refuses to answer whether Monique hired multiple people who were in the country illegally |

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.

EXHIBIT 2



| | |
|---|---|
| 81:10-81:13 | Cruz-Mendoza states he has only worked every day aside from the DUI incident |
| 81:18-82:6 | Cruz-Mendoza explains he pled guilty because he was driving the truck-trailer |
| 82:13-82:17 | Cruz-Mendoza maintains his understanding that he only pled guilty to being behind the wheel |
| 83:2-83:8 | Cruz-Mendoza acknowledges Scott Miller did nothing wrong |
| 83:9-83:16 | Cruz-Mendoza states he blames no one, citing a truck failure, and that's why he pled guilty |
| 84:3-84:7 | Cruz-Mendoza explains he was following GPS because he didn't know that part of Colorado |
| 84:13-84:17 | Cruz-Mendoza states when following GPS, you go where it tells you to go |

### Legal Status and Documentation Issues ↻

The questioning becomes contentious when discussing Cruz-Mendoza's legal status to drive on American roads, with his attorney invoking Fifth Amendment privilege. Attorney Caplis argues this relates to consciousness of guilt in a felonious killing case. Cruz-Mendoza admits he had not kept hours-of-service logs during the fatal trip, though he had been off the previous two days.

| | |
|---|---|
| 84:18-85:8 | The questioning becomes contentious regarding Cruz-Mendoza's legal status to drive on American roads |
| 85:5-85:13 | Attorney Ripplinger objects to the line of questioning as harassment and invokes Fifth Amendment privilege |
| 85:14-85:18 | Attorney Caplis disagrees, citing the importance of consciousness of guilt in a felonious killing case |
| 85:20-85:23 | The interpreter requests to convey the legal discussions to the witness |
| 85:24-86:3 | Caplis asks Cruz-Mendoza if he kept any logs on the trip that ended with the fatal crash |
| 86:4-86:5 | Cruz-Mendoza states he had been off two days, Saturday and Sunday |
| 86:6-86:12 | Cruz-Mendoza admits he did not keep hours-of-service logs during the fatal trip, saying he hadn't filled out the paper yet |

### Immigration Status Debate and Deposition Continuation ↻

The deposition concludes with heated exchanges over Cruz-Mendoza's immigration and deportation history. When attorney Caplis raises questions about deportations and their connection to Miller's death, Cruz-Mendoza's attorney Ripplinger objects and invokes Fifth Amendment privileges. After debates about translation protocol and immigration status relevance, Caplis keeps the deposition open due to unresolved issues, with agreement that other counsel may ask questions.

| | |
|---|---|
| 86:20-86:23 | Cruz-Mendoza states he had papers in the trailer when asked about why Monique hadn't given him any |

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.

EXHIBIT 2

**depo summary PRO**

| | |
|---|---|
| 86:24–87:10 | Discussion ensues about media reports regarding Cruz-Mendoza's deportation history |
| 87:11–88:9 | Attorneys debate the relevance of immigration status to the case and Fifth Amendment privileges |
| 88:10–89:16 | Extended discussion occurs about proper translation protocol for legal arguments |
| 89:17–89:24 | Attorneys agree to address immigration status questions as a whole rather than individually |
| 90:14–90:17 | Caplis asks if Scott Miller would be alive if Cruz-Mendoza had stayed out after his 14th deportation |
| 90:18–90:22 | Ripplinger objects and instructs Cruz-Mendoza not to answer, citing harassment |
| 90:23–91:6 | Caplis keeps the deposition open due to outstanding issues |
| 91:7–91:14 | The deposition concludes with Caplis noting they don't object to other counsel asking questions |
| 91:15–91:18 | Ripplinger agrees that other counsel can ask questions |

### Additional Questioning by Other Attorneys ↻

Burke questions Cruz-Mendoza about his connections in Indio, where he lives with family and works construction with his brother. Cruz-Mendoza clarifies his interactions with a female broker who arranges loads for Monique Trucking, though he doesn't know her name or employment details. Burke concludes questioning, while Vig reserves questions for later.

| | |
|---|---|
| 91:19–91:24 | Burke begins questioning Cruz-Mendoza about his earlier testimony regarding speaking with a woman in Indio |
| 91:24–91:25 | Cruz-Mendoza clarifies he lives with family in Indio and works in construction with his brother |
| 92:1–92:4 | Burke asks about phone calls with a woman in Indio about loads, and Cruz-Mendoza clarifies it was the broker |
| 92:8–92:9 | Cruz-Mendoza states he doesn't know how Monique Trucking works with the broker but they get loads |
| 92:10–92:16 | Cruz-Mendoza says he doesn't know if the woman was employed by the broker or remember her name |
| 92:17–92:19 | Burke concludes questioning, and Jachimiak has no questions |
| 92:20–92:23 | Vig reserves questions due to time constraints |

### Deposition Conclusion and Administrative Details ↻

The deposition concludes at 2:39 PM, followed by a brief off-record discussion about transcript copies among attorneys Caplis, Ripplinger, and Vig. The proceedings end at 2:40 PM, with the remaining document consisting of certification pages and the reporter's certificate.

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.



| | |
|---|---|
| 92:24-93:1 | The deposition concludes at 2:39 PM |
| 93:2-93:11 | Off-record discussion occurs about transcript copies, with Caplis, Ripplinger, and Vig requesting copies |
| 93:12-93:14 | The proceedings conclude at 2:40 PM |
| 94:1-95:25 | The remainder of the document contains certification pages and reporter's certificate |

## Transcript Text

```
                        Ignacio Cruz-Mendoza
                          March 27, 2025
  1      DISTRICT COURT, JEFFERSON COUNTY, COLORADO
  2      Case No. 2025CV30010, Courtroom 12
  3      _____

  4      DEANN MILLER as surviving spouse of SCOTT MILLER,
  5      deceased,
  6           Plaintiff,
       v.
  7      MONIQUE TRUCKING LLC, a California limited company,
  8      and IGNACIO CRUZ-MENDOZA, an individual,

  9           Defendants.
 10      _____
 11       VIDEO-RECORDED DEPOSITION OF IGNACIO CRUZ-MENDOZA
                          March 27, 2025
 12      _____

 13                 PURSUANT TO NOTICE, the video-recorded
 14      deposition of IGNACIO CRUZ-MENDOZA was taken on behalf
 15      of the Plaintiff at Jefferson County Detention Center,
 16      200 Jefferson County Parkway, Golden, Colorado 80401,
 17      on March 27, 2025, at 9:24 AM, before Deborah A.
 18      VanDemark, Registered Professional Reporter and
 19      Colorado Realtime Certified Reporter.




                U.S. Legal Support | www.uslegalsupport.com
[[ Line numbers on this page added during summarization for reference ]]
```

Ignacio Cruz-Mendoza
March 27, 2025

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.

**EXHIBIT 2**

**depo summaryPRO**

```
11      couldn't get out at the -- when it -- right after it
12      happened, and I fractured my arm and my foot.
13              THE INTERPRETER:  For the record, the
14      interpreter would need to clarify the body parts
15      because they're not clear as -- as spoken by witness.
16              A.   I fractured a shoulder, and I can't
17      move this arm.  And I also fractured a -- and I also
18      fractured a leg.
19              Q.   (BY MR. CAPLIS)  Any other injuries?
ւ20             A.   I have a lot of pain, and I can move
21      this arm, but I can't raise this arm any higher than I
22      just did.  I wasn't able to take my phone or any
23      documents or my GPS with me because I was about to be
24      taken into custody.
25              Q.   Okay.  Did you have a cell phone with

                 U.S. Legal Support | www.uslegalsupport.com     17
```

```
                         Ignacio Cruz-Mendoza
                           March 27, 2025
1       you at the time of the June 11, 2024, crash?
2               A.   Everything got left behind in the
3       truck.
4               Q.   Okay.  But you did have a cell phone
5       with you on the day of the crash, correct?
6               A.   Yes, I had everything.
7               Q.   Okay.  And what's the number for that
8       cell phone that you had with you on the day of the
9       crash?
10              A.   Well, I honestly don't remember.  Well,
11      I don't remember the lady broker's number or my
12      number.  I mean, the -- I was able to get in touch
13      five days later.  I was concerned because --
14              THE INTERPRETER:  And for the record,
15      the interpreter will inquire as to the remainder of
16      the answer which was not intelligible to the
17      interpreter.
ւ18             A.   Okay.  Five days later I got in touch
19      with my mother because I was concerned about her, and
20      I was able to get in touch with my ex-wife because I
21      do know her number off the top of my head.
22              Q.   (BY MR. CAPLIS)  Okay.  What's her
23      number?
24              THE INTERPRETER:  Okay.  For the
25      record, the interpreter will confirm the number to

                 U.S. Legal Support | www.uslegalsupport.com     18
```

```
                         Ignacio Cruz-Mendoza
                           March 27, 2025
ւ 1     ensure accuracy.
  2             A.   (559)639-8007.
  3             Q.   (BY MR. CAPLIS)  Thank you.  What's her
```

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.

**EXHIBIT 2**

**depo summaryPRO**

```
 4    name?
 5            A.    Julia.
 6            Q.    Last name?
 7            A.    Thomas, T-h-o-m-a-s.
 8            Q.    Thank you.  Who was your cell phone
 9    service through on June 11, 2024?
10            A.    Well, first I had Verizon for my -- my
11    cell, but then when I switched -- I switched to
12    another company.  I don't remember what name because
13    it was a phone that was loaned to me by a friend until
14    I paid him back, like, before the accident, but I
15    don't know what carrier that was.
16            Q.    Was the cell phone that you had with
17    you on June 11, 2024, in your name?  Was the service
18    in your name?
19            A.    Yes.
20            Q.    And to clarify, was that service
21    through Verizon?
22            A.    Well, that's the one I was having
23    trouble with, as I mentioned.  And since I had gotten
24    it loaned to me by a friend, I don't know what the
25    company was.

                U.S. Legal Support | www.uslegalsupport.com    19
```

```
                      Ignacio Cruz-Mendoza
                        March 27, 2025
 1            Q.    Okay.  So on June 11, 2024, were you
 2    using a phone a friend had loaned you?
 3            A.    No.  He cosigned the phone for me, but
 4    I don't know what company it was through.
 5            Q.    But the service was in your name?
 6            A.    Yes.
 7            Q.    So you would receive the bill?
 8            A.    Yes.
 9                  THE INTERPRETER:  For the record, the
10    interpreter would need to change a couple renditions
11    that the phone was cosigned for, not a loaner phone.
12            Q.    (BY MR. CAPLIS)  Who is that friend?
13            A.    Back where I was living in Indio.
14            Q.    And what is his name?
15            A.    His name is Armando.
16            Q.    Last name, please.
17                  THE INTERPRETER:  Interpreter spelling,
18    O-n-t-i-v-e-r-o-s, Ontiveros.
19            Q.    (BY MR. CAPLIS)  Where does
20    Mr. Ontiveros live?
21            A.    In Indio.
22            Q.    What address?
23            A.    Well, I'm telling you I don't know it
24    off the top of my head.  It's where I live.
25            Q.    What's his phone number?

                U.S. Legal Support | www.uslegalsupport.com    20
```

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.

**EXHIBIT 2**

```
 3              Q.   Who did you call after you had been
 4    loaded up at Searing?
 5              A.   I called Manrique.
 6              Q.   Anybody else?
 7              A.   No.
 8              Q.   Please tell us everything that happened
 9    while you were at Searing.
10              MR. RIPPLINGER:  Form.
11              MS. VIG:  Join.
12              A.   Well, nothing.  They just loaded up the
13    truck and -- and then I took it and left and headed to
14    where I was supposed to go, and then the accident
15    happened.
16              Q.   (BY MR. CAPLIS)  How long were you at
17    Searing?
18              A.   About two hours.
19              Q.   What did you do during those two hours?
20              A.   Well, I waited for them to load it.     I
21    tied it down, and then I headed where I needed to go.
22    It had been -- hadn't been used Saturday and Sunday
23    and had a tank of diesel.
24              Q.   How many people did you speak with
25    while you were at Searing?

                U.S. Legal Support | www.uslegalsupport.com      37
```

```
                          Ignacio Cruz-Mendoza
                            March 27, 2025
 1              A.   Not even with one person there, just
 2    the lady at the office.
 3              Q.   Did Searing have anybody who was
 4    Spanish-speaking?
 5              A.   Yes, there was lady there who did the
 6    load.
 7              Q.   Okay.  And did you speak with her in
 8    Spanish?
 9              A.   Yes.
10              Q.   Who did the loading?
11              A.   The one who did the loading, the
12    forklift driver.
13              Q.   How many people were involved in doing
14    the loading?
15              A.   Just the person who did the loading and
16    myself.
17              Q.   How long did it take to load?
18              A.   Well, let's say that I was there
19    waiting one hour for -- to get the load, and then the
20    loading actually took an hour.
21              Q.   Please describe for us what that
22    loading process involved.
23              MR. RIPPLINGER:  Objection, foundation.
24              MS. VIG:  Join.
25              Q.   (BY MR. CAPLIS)  Let me ask a different

                U.S. Legal Support | www.uslegalsupport.com      38
```

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.

**depo summaryPRO**

```
                    Ignacio Cruz-Mendoza
                      March 27, 2025
 1    question.  That's a good objection.  What did you
 2    observe during the loading process?
 3         A.   Well, no, everything was fine.
 4    Everything was regular.  Everything was fine as
 5    always.
 6         Q.   Please tell us in specific detail what
 7    you observed happen during the loading process.
 8         A.   The usual.
 9         Q.   Thank you.  For those of us that
10    haven't watched Searing load pipe and metal beams onto
11    a truck, please describe in detail what you saw.
12         A.   Well, I'll say it again.  You know,
13    as -- everything was fine.  I didn't see anything out
14    of the ordinary.
15         Q.   Did you actually see the loading occur?
16         A.   Yes, because I helped him put the bars
17    underneath where the steel was being loaded.
18         Q.   And we'll get to that, but let's begin
19    with you telling us, please, everything you saw occur
20    during the loading process.
21              THE INTERPRETER:  For the record, the
22    interpreter would appreciate assistance from those of
23    you from this table who have much more detailed
24    information on what the case involves.  The
25    interpreter has none coming into this other than

           U.S. Legal Support | www.uslegalsupport.com    39
```

```
                    Ignacio Cruz-Mendoza
                      March 27, 2025
 1    where -- where to show up.  What is referred to in
 2    loading a truck with steel -- steel pipe, the bars --
 3    what's the word for that?  Rods?  Bars?
 4              Everything was professional.
 5              Would they be rods?  The interpreter
 6    wants to make sure he's using the proper terms.
 7              MR. CAPLIS:  Sure.  Metal pipes and
 8    metal beams.
 9              MR. RIPPLINGER:  Are we talking about
10    what the actual load was, or are you asking what he
11    said he helped put on the trailer of the truck?
12              THE INTERPRETER:  Okay.  It's kind of
13    like what I'm hearing is there are like bars and then
14    over that the -- the -- the -- the steel pipes, but --
15    I mean, I can differentiate between the -- the
16    actual -- the beams and the -- and the -- the pipes,
17    but I'm not sure what's meant by the bars.  I don't
18    know if they're like something to provide support.
19              MR. RIPPLINGER:  Maybe -- I think what
20    he said is on the trailer -- whatever is on the bed in
21    which the load sits on top of.  So it sounds like
22    there is some sort of pipe or beam separating the
23    actual bed and the loads on top of it.  Maybe that's a
```

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.

**EXHIBIT 2**

depo summary PRO™

```
                    Ignacio Cruz-Mendoza
                       March 27, 2025
 1          A.   I fill out a document.  They give you a
 2   document with instructions.  You have to deliver that
 3   to the forklift operator.  There's another paper that
 4   has their rules like that you have to wear work boots
 5   when you're there.
 6          Q.   And so which secretary then made these
 7   other entries on this form, Exhibit 1?
 8          A.   The same, the one because there's only
 9   one there.
10          Q.   And this was a woman?
11          A.   Yes.
12          Q.   Thank you.  Now, did you put the
13   address for your delivery in New Mexico into your
14   phone for directions?
15          A.   Exactly.  I enter it into the GPS, and
16   that's how I get there.
17          Q.   Okay.  And was it the GPS in your phone
18   or your separate GPS device?
19          A.   Phone.
20          Q.   Thank you.  What time did you leave
21   Searing on June 11?
22          A.   I sincerely don't recall.  It's been
23   quite a while.
24          Q.   Now, you've told us several times that
25   the loading was done professionally.  Do you remember

              U.S. Legal Support | www.uslegalsupport.com    57
```

```
                    Ignacio Cruz-Mendoza
                       March 27, 2025
 1   telling us that?
 2          A.   Yes.
 3          Q.   Okay.  How do you know that the loading
 4   was done professionally?
 5          A.   I see how loading is done everywhere.
 6   And, you know, it's not like this was done any
 7   differently.  I mean, this was a terrible accident.
 8   And almost all my trips were to Colorado, and I never
 9   had any -- any problems elsewhere.
10          Q.   Are you a trained professional loader
11   of steel pipe and beams?
12               MR. RIPPLINGER:  Objection, form.
13          A.   That was my job, yeah.  And I even
14   transported train tires.
15          Q.   (BY MR. CAPLIS)  Well, Searing did the
16   loading of this metal, this pipe, these beams in the
17   way you just described, correct?
18          A.   Well, the thing is, you know, in Pueblo
19   I'd also get pipes loaded.  And, you know, every --
20   anywhere I'd go, there would be an inspection.  So
21   it's not like there was ever a place where they'd just
22   say, "All right, you can go," without an inspection.
23   Well, excuse me.  I mean, tell me -- tell him wherever
```

This content has been generated by an artificial intelligence language model. While we strive for accuracy and quality, please note that the information provided may not be entirely error-free. We recommend independently verifying the content. We do not assume any responsibility or liability for the use or interpretation of this content.

EXHIBIT 2